In the

# United States Court of Appeals

## For the Seventh Circuit

Nos. 15-2628, -3221, -3861, 16-1870

MIDWEST OPERATING ENGINEERS WELFARE FUND, *et al.*,

*Plaintiffs-Appellees*,

*v.*

CLEVELAND QUARRY, *et al.*,

*Defendants-Appellants*.

Appeals from the United States District Court for the
Northern District of Illinois, Eastern Division.
Nos. 14 C 2557, 14 C 8752, 15 C 4446 — **Milton I. Shadur,
John Z. Lee, Amy J. St. Eve**, *Judges*.

ARGUED NOVEMBER 8, 2016 — DECIDED DECEMBER 20, 2016

Before WOOD, *Chief Judge*, and POSNER and ROVNER, *Circuit Judges*.

POSNER, *Circuit Judge*. The plaintiffs in this labor litigation are employee welfare and pension funds (we'll drop "and pension" to simplify the opinion). Three defendants are named. Each is a division (not, so far as we are able to determine, a subsidiary) of RiverStone Group, Inc., a producer of crushed stone, sand, and gravel. Each division is a de-

fendant in a separate, but nearly identical, suit before a dif-
ferent district judge. The judges were apparently confused
by the fact that each division had a separate collective bar-
gaining agreement, but that turns out to be a distinction
without a difference. The proper defendant is the company,
RiverStone, not its divisions, and we shall assume it is in-
deed the one and only defendant in what is really one case,
not three cases.

RiverStone's collective bargaining agreements were with
Local 150 of the International Union of Operating Engineers,
AFL-CIO. The latest agreement, made in 2010, was sched-
uled to expire in 2015. It required RiverStone to contribute a
specified dollar amount to welfare funds specified in the
agreement "for each hour for which an employee receives
wages under the terms of this Agreement." But in 2013 em-
ployees in one of RiverStone's divisions voted in an election
supervised by the National Labor Relations Board to decerti-
fy Local 150 as their collective bargaining representative,
and this was followed by similar votes by employees at the
other two divisions mistakenly named as defendants in this
litigation. Whereupon RiverStone stopped contributing to
the welfare funds, precipitating these suits against it by the
funds under 29 U.S.C. § 1145, a provision of ERISA, added
by the Multiemployer Pension Plan Amendments Act of
1980, Pub. L. 96-364, 94 Stat. 1208, that creates a right to sue
to collect delinquent employer contributions. The funds seek
payment of the contributions that would have been due pur-
suant to the terms of the last collective bargaining agreement
until its 2015 expiration. In each suit a different district judge
granted summary judgment in favor of the funds, confirm-
ing that RiverStone had to continue making the contribu-
tions to the funds specified in that last, 2010, collective bar-

gaining agreement until the agreement expired by its terms in 2015.

It is arguable that the agreement expired earlier, when the union was decertified, as a result of which one of the two parties to the agreement effectively vanished, since it could no longer enforce any part of it (the "agreement" among the three divisions of RiverStone doesn't count; RiverStone and the union were the only real parties to the agreement). And the collective bargaining agreement stated that "the Employer's responsibility to make contributions to the Welfare Plan[s] shall terminate upon expiration of this agreement."

RiverStone quotes our statement in *Central States, Southeast & Southwest Areas Pension Fund v. Schilli Corp.*, 420 F.3d 663, 669 (7th Cir. 2005), that "although the decertification voided the 1994 CBA, the terms of the Participation Agreement make clear that [the company's] obligations survive that event," even though the union, no longer representing the employees, could not have enforced a participation agreement. But because the agreement made the company's obligations to the pension fund survive the decertification, *Schilli* didn't have to, and didn't, decide that a collective bargaining agreement could not continue to impose a contribution obligation after the union's decertification, which merely eliminated *its* right to enforce the collective bargaining agreement, including provisions relating to contributions to employee welfare plans. *Schilli* was explicit that "the union is not the only party with standing to enforce" an employer's obligation to contribute to an employee welfare plan, noting that the Multiemployer Pension Plan Amendments Act "authorizes multiemployer plans to sue for delinquent contribu-

tions owed 'under the terms of the plan or under the terms of a collectively bargained agreement.'" 420 F.3d at 670.

The "delinquent contributions" in the present case were the contributions that RiverStone had failed to make in the interim between the decertification of the union and the expiration of the collective bargaining agreement. That an employer could cease making contributions to a plan once its employees' union is decertified is no defense. For "once [multiemployer plans] promise a level of benefits to employees, they *must* pay even if the contributions they expected to receive do not materialize." *Central States, Southeast & Southwest Areas Pension Plan v. Gerber Truck Service, Inc.*, 870 F.2d 1148, 1151 (7th Cir. 1989) (en banc) (emphasis added). Their promise is binding, contractual. And so "if some employers do not pay, others must make up the difference." *Id.* In short, "nothing in ERISA makes the obligation to contribute depend on the existence of a valid collective bargaining agreement." *Id.* at 1153.

But what is one to make of the provision of the collective bargaining agreement that "the employer's responsibility *to make contributions* to the Welfare Plan[s] shall terminate upon expiration of this agreement" (emphasis added)? The meaning depends on whether "expiration" means the date on which the agreement becomes unenforceable or the date on which it lapses by passage of time. It became unenforceable *by the union* when the union was decertified, whereby the employer was no longer bound to the promises it had made to the union; but the agreement did not thereby cease to exist—and therefore did not expire—until its five-year term ended. By prematurely ceasing to contribute to the welfare funds, RiverStone became liable under 29 U.S.C. § 1145 to

make delinquent contributions, which is the relief sought by the funds and ordered by the three district judges whose identical rulings RiverStone challenges. RiverStone might have negotiated a collective bargaining agreement that obligated it to contribute to the funds only unless and until the union was decertified. But it didn't.

Another path to the same result is to note that the plaintiff funds were third-party beneficiaries of the collective bargaining agreement and therefore entitled to enforce it even if another enforcer—the union—fell out.

RiverStone makes two other arguments for reversal. The first is that the collective bargaining agreement required it only to contribute to the funds for each hour an employee is paid "under the terms of the [Collective Bargaining] Agreement." True, but irrelevant to this case. After the decertification, RiverStone's employees were no longer working "under the terms of" the collective bargaining agreement, so RiverStone could pay them lower wages or otherwise change the terms of their employment from what the collective bargaining agreement had provided. But as we've explained, so far as benefits law is concerned the employees were still working "under the terms of" the collective bargaining agreement. The agreement established a five-year-long obligation for RiverStone to contribute to the funds for each employee in the bargaining unit (that is, each employee who received wages "under the terms of the agreement"). The funds budgeted accordingly. The agreement did not provide that RiverStone could stop contributing as soon as its employees' union was decertified.

The second argument is that the Labor Management Relations Act forbids payments to trust funds that are not "es-

tablished by such representative" of the employer's employees, 29 U.S.C. § 186(c)(5). Again true, but again irrelevant. The union, Local 150, established the funds and did so at a time when it was the representative of RiverStone's employees. The decertification of the union, years later, did not alter the fact that the funds had been established by the representative.

Each of the district judges ordered RiverStone (more precisely, each judge ordered one of the three divisions that are the named defendants) to reimburse the union for the delinquent contributions. Those judgments are

AFFIRMED.